## Murphy v. Commonwealth.

Jan. 23, 1940.

Thos. J. Underwood and J. E. Robinson for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

Vadie Murphy appeals from a judgment convicting him of manslaughter and fixing his punishment at eight years' imprisonment.

The grounds urged for reversal are: (1) that the court erred in not permitting the defendant to relate in detail his full statement of what happened at the time of the killing of deceased made to Clem Murphy, Buford Murphy and others; and (2) that the verdict is not sustained by the evidence.

The facts and circumstances surrounding the shooting and killing of the decedent, Charlie Clouse, are shown by the testimony to be as follows:

On the evening of August 26, 1937, between 7 and 8 o'clock, Charlie Clouse was shot and killed on Buckeye road in Garrard county, Kentucky, at a point immediately in front of his home and when in plain view of his wife and little daughter.

At the August term of the Garrard circuit court, the grand jury returned an indictment, charging his neighbor, Vadie Murphy, with his murder.

Upon trial, the accused pleaded not guilty. To maintain such plea, he and his witnesses testified that he, the defendant, had not fired the shot that killed dece-

dent, but that his son, Leonard Murphy (as was admitted and testified by Leonard), had fired the rifle shot that killed decedent and had done so in order to save defendant's life, as he was at the time being assaulted by decedent.

It is further shown that the decedent, Charlie Clouse, at the time he was killed, was living as a tenant upon the farm of Judge Stapp and with his family occupied a tenant house situated on the north side of Buckeye road, almost directly opposite the house in which lived the defendant, Vadie Murphy, and his family.

Murphy's home, some 10 feet back of the road, was located on a downward sloping hillside, some 5½ or more feet below the road level. The roadway, some 30 feet in width, was fenced with wire on each side.

Murphy had owned and lived in his house for several years, while Clouse had lived at his place for only a few months.

Though the relationship between these neighbors was described as friendly, it was yet not cordial, and the defendant states that they had stopped speaking and had nothing to do with each other.

The witnesses of the opposing parties testify in full accord that the tragic event of Clouse's killing arose out of the supposed occurrence of a fight between the Clouse cat and the Murphy dog.

On the evening in question, both the defendant, Murphy, and the decedent, Clouse, had returned rather late to their homes after working in their tobacco crops and were sitting quietly in their yards or on their porches, when the peace and quiet was rudely broken and the trouble started by the cries or squealing, as the Clouse family supposed, of their cat, which they thought meant she was being annoyed by the Murphy dog.

It appears that the Clouse cat had just crossed the road and caught a young rabbit near the Murphy home, which squealed. Mrs. Clouse remarked to her husband that she believed their cat was having a fight and that Mr Murphy was "sicking" their dog on her, which remark the defendant, Vadie Murphy, overheard. Mrs. Clouse states that Murphy then got up off of his porch, went into the house and got his rifle and came back out on the road; that he said to her husband, "What did you say?" and that her husband replied,

"Don't put your dog on my cat;" that Vadie Murphy then said, "I double dare you, you little sawed off s. o. b.," and picked up a rock and threw it against the side of the house; and that when her husband accepted the dare and went out in the road, over her protest, Murphy at once knocked him down and as he was attempting to get up, shot him with the rifle, instantly killing him, the bullet entering his left side, about three inches above the nipple, and, ranging at an angle downward, lodging in his heart.

Contrary to this, the commonwealth's theory of the killing, it is the defendant's contention that the decedent, Clouse, enraged over the cat and dog episode, provoked the difficulty with Murphy and came out into the road brandishing a razor, with which he inflicted a two inch cut on Murphy's side and that as he was trying to push him back, he told the decedent that he had already "cut him bad" and urged him to stop slashing at him with his razor; that his son Leonard, who was standing nearby, hearing this and witnessing their difficulty went into the house, got his rifle, and on his return, seeing that decedent was still assaulting his father with the razor, he shot and killed him.

Mrs. Clouse states that she was standing at her gate when her husband was shot by the defendant and that he said to her, "Lord have mercy, Florence, Vadie shot me." She further states that upon going to him, where he lay dying in the road, she did not see any weapon or razor on or about her husband nor did he have or own any razor except a safety razor; that the only weapon she saw there was the rifle held in the hands of the defendant, with which she and her young daughter, Lucille (who, also, so testified), had just seen him shoot the decedent.

After this shooting and killing of Clouse, the Murphy family quickly emerged from their house and congregated in the road about the body of Clouse. Mrs. Clouse testifies that she asked them to help her remove his body to his home, but this they declined to do; that she left her husband's body lying in the road and went to the nearby home of her landlord, Judge Stapp, and asked him to call a doctor and "the Law;" that Judge Stapp, after being informed of what had taken place, took her, together with two men who were then at his home, in his car over to where Clouse's body had been left in the road and helped move it to the Clouse home.

They all testify that no razor was found on or about the body of Clouse, nor did any of the Murphys, except the defendant, testify that a razor was found on or about the decedent's body.

The testimony given by the defendant and his numerous witnesses was further that immediately following the shooting and killing of the decedent, he and his son, Leonard, went over to the home of Clem Murphy, some 2 miles distant, where they called Dr. Edwards to come and dress the two inch cut in his side. Further, the defendant and also his son, it appears, told the Clem Murphy family, and several others whom they found there on their arrival, that the decedent had assaulted and cut him with a razor and displayed his wound and that Leonard, on seeing the decedent was assaulting him and had cut him, got his rifle and shot decedent in order to save his father's life. Further the defendant told them that the decedent had, when assaulting him, cut him in the side and had also cut his clothes and the apron of his overalls.

Dr. Edwards, who dressed the defendant's wounds, stated upon cross-examination that the position and character of the defendant's cut was such that he could have inflicted it himself.

Upon submission of the case to the jury, under proper instructions of the court, it returned a verdict finding the defendant guilty and fixing his punishment therefor as stated above.

Appellant, asking reversal of the judgment on the grounds assigned, first insists that the court erred in failing to direct the jury to find for the defendant, as moved for by counsel, and also that the jury's verdict, finding the defendant guilty, is not supported by the evidence. Defendant argues that the only persons present at and witnessing the killing were the decedent's wife and infant stepdaughter, on the one side, and the several adult members of the Murphy family, on the other, and that the evidence given by the latter, that the decedent was not shot and killed by the defendant Murphy, but by his son, Leonard, at a time when he saw that his father had been cut and was still being assaulted by the decedent with a razor, so far overrides and outweighs that given by decedent's wife and daughter as to render the latter but a scintilla of evidence, which is insufficient to support the verdict.

With this contention we cannot concur, in that the rule (too well established to call for citation of supporting authority) is that it is within the jury's province to determine whom of the witnesses it will believe and what weight and credibility it will give to the testimony of the respective witnesses upon the factual issues.

Certainly the testimony here given by the wife and her eleven year old daughter, that they were standing nearby at the time decedent was shot and were eyewitnesses to his killing by their neighbor, Vadie Murphy, and that they distinctly saw him first knock down the decedent and then, as he was attempting to rise, shoot him with his rifle, was substantial and forceful evidence as to who killed the decedent, which the jury was authorized to accept as trustworthy and decisive of that question, if such was their judgment.

That such was its nature, and potent to induce conviction, is manifest from the fact that the only motive decedent's wife could have had in testifying that it was the defendant, rather than his son, who shot her husband was her one desire that the man guilty of his death should not go acquitted but be punished therefor.

It is against the course of nature and common sense that the witness, widowed by the alleged felonious killing of her husband and seeing almost face to face the man who killed him, could have been influenced by any ulterior considerations to permit him to escape punishment therefor by laying his killing at another's door.

Also, the defendant's contention that the decedent was armed with a razor, when sitting upon his porch, resting from his day's work, with no thought or apprehension of any impending menace or imminent difficulty, is hardly consonant with common sense or the customary habit of living, as it is most improbable that one would go about his farm work and his home, armed with a razor or other weapon, when conscious of no threat nor apprehending any trouble with his neighbor. The situation tended clearly to lend support to the verity of the wife's testimony that he had no weapon or razor when challenged by appellant to combat.

It is therefore our conclusion that the defendant's contention that the evidence of the commonwealth was insufficient to sustain the jury's verdict must be dismissed as being without merit.

The next objection argued is that the court erred

in not permitting the defendant to explain in full his statements of what happened at the time of the killing of deceased, made to Clem Murphy, Buford Murphy and others, shortly thereafter, after the statements made at the Murphy home had been put in issue upon cross-examination of the defendant's witnesses.

The rule invoked, as supporting this contention, is to the effect that where the incriminatory part of statements made by a defendant in a criminal case has been given in evidence against him by the state, he may, by cross-examination or by fresh evidence from his own witnesses, prove the residue of the statements made by him at that time, including exculpatory or self-serving statements, so far as such statements relate to the same transaction.

The appellant cites the Massachusetts case of Commonwealth v. Britland, 15 N. E. (2d) 657, 118 A. L. R. 132, as declaring the proper rule applicable in such case. The ruling in that case, as summarized in No. 1 of its syllabi, is that:

"Where the prosecution proves statements of an accused tending to show that he is guilty, the rule that a defendant in a criminal case has no right to introduce in evidence self-serving statements does not preclude him from eliciting on cross-examination of the witnesses for the prosecution the whole of the subject matter, even though statements so drawn out are favorable to him."

It may be conceded that this statement of the rule, as declared in the Britland case, may be taken as being also equally a statement of the rule of this jurisdiction, repeatedly declared in numerous cases, many of which are cited in the annotation of the Massachusetts case, supra, page 140, 118 A. L. R. Among these cited cases are Addington v. Commonwealth, 200 Ky. 290, 254 S. W. 889; Collins v. Commonwealth, 227 Ky. 349, 13 S. W. (2d) 263; Howard v. Commonwealth, 234 Ky. 45, 27 S. W. (2d) 410.

Appellant, we conceive, improperly insists that this rule, as to the admissibility of such statements, is here applicable and serves to make the learned trial court's ruling erroneous, in refusing to permit the defendant, Vadie Murphy, to state to the jury fully and completely the conversations had with and the statements made by him to his witnesses at Clem Murphy's home, as soon as

he arrived there after the shooting and killing of the decedent, after the commonwealth had asked Dr. Edwards, "Could the defendant Murphy have cut this place on his side himself?" and been answered in the affirmative and also after the appellant's witnesses, Clem Murphy, Buford Murphy and others, had testified as to the condition of defendant with respect to his wounds and the cuts in his clothing they had seen when he arrived at Clem Murphy's house shortly after the killing. It is insisted that under this rule defendant had the right, on cross-examination, to give in detail the self-serving statements made to Dr. Edwards and his whole conversation had with the other witnesses at Clem Murphy's house, within about five minutes, he claims, after the killing of Clouse, in that the incriminatory part of the statements had been given in evidence against him by the state.

The ruling of the court, here attacked as erroneous and in violation of the cited rule, we conceive to be proper.

The commonwealth did not upon cross-examination elicit here only the incriminatory parts of these statements made to his witnesses, nor, in fact, did it question them at all as to his self-serving statements made to or conversation had with them as to his difficulty with deceased, but the doctor who dressed the defendant's wounds was merely asked if the latter could have himself inflicted them, which he answered in the affirmative, and also his witnesses, who testified that they had seen the defendant's condition when at Clem Murphy's, were asked if they had then seen cuts upon the apron of the overalls worn by him.

It would appear that such being the character of testimony excluded, the case does not come within the rule invoked by defendant, where the commonwealth upon cross-examination has put in evidence only incriminatory parts of defendant's statements, when it is held that the defendant, who is prejudiced by such partial statements, shall have the right to have detailed the whole of his statements and conversations concerning his case made to and had with the witnesses.

It is therefore our conclusion that the trial court's ruling, in overruling the motion for a peremptory verdict and in permitting the jury to find from the evidence whether or not the defendant was guilty as charged, and its further ruling, refusing to permit defendant's wit-

nesses to give in detail the full statements made to and conversations had with them by defendant and his representations as to how and under what circumstances the deceased had been shot upon the occasion in evidence, were altogether proper, from which it follows that the judgment should be and it is affirmed.