## Burden v. Commonwealth.

Feb. 8, 1944.

554

Otto C. Martin for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

At the May, 1943, term of the Muhlenberg circuit court the grand jury returned an indictment against the appellant charging him with the wilful murder of Rudolph Hope. At a trial beginning on May 19 and concluded on May 20 the jury returned a verdict finding appellant guilty as charged in the indictment and fixed his penalty at confinement in the penitentiary during his natural life. Motion and grounds for a new trial were filed and overruled and from a judgment entered upon the verdict this appeal is prosecuted.

The first ground urged for reversal is that the names of the witnesses who testified before the grand jury were not written on the indictment as provided in section 120 of the Criminal Code of Practice. It appears that when the clerk copied the record, including the indictment, for the purpose of the appeal, by inadvertence and oversight he failed to copy the names of the witnesses on the indictment. Upon motion of the Commonwealth an additional and supplemental transcript was filed together with an affidavit of the clerk in support thereof showing that when the indictment was returned by the grand jury and filed in open court by the clerk the names of the witnesses who testified before the grand jury were listed on the indictment as required by the code, supra, and

that they were left off by inadvertence and oversight of the clerk. This supplemental or corrected transcript is not disputed or otherwise questioned by appellant. Since the names of the witnesses were written on the indictment at the time it was returned the fact that the clerk failed by oversight and inadvertence to copy the names of the witnesses for the purpose of appeal could not have prejudiced the rights of appellant. Another complaint is that the court erred in admitting certain incompetent evidence against appellant and rejected certain competent evidence offered, by him in his behalf.

The killing occurred on Sunday morning, February 14, 1943, at Browder, a mining village in Muhlenberg county, Kentucky. Appellant and the deceased were both in the employ of the Wickliffe Coal Company and had known each other for a number of years. So far as the record discloses they had had no previous trouble and there was no ill will or feeling existing between them. On the morning of the homicide appellant left his home before breakfast and went to the mine for some purpose and on his return home he went by the home of Grant McKenney and engaged in a controversy with him, to which we will later refer in our discussion of the evidence. After he returned to his home Edward Wickliffe, one of the owners of the Wickliffe Coal Company, appeared at appellant's home and he and appellant became engaged in an argument or controversy resulting in a fight in which Wickliffe struck appellant upon the head with a pistol, inflicting on him several wounds. After this occurred appellant left his home and went to the homes of various neighbors in the mining village and appeared to be in a hostile and belligerent state of mind, and after entering a number of homes he went to the home of the deceased and became engaged in a controversy with him. Deceased's wife immediately left their home and started to the home of a neighbor and about the time she reached there they heard a shot fired and when the neighbors went to the home of the deceased he was mortally wounded with a gun shot from which he died shortly thereafter. Appellant immediately disappeared and was found by the officers about 2 p. m., lying on the front porch of a neighbor with a pan over his head.

Appellant does not deny that he shot and killed the deceased but interposes as his sole defense that as a re-

sult of the blows on his head with the pistol by Wickliffe he was rendered unconscious or temporarily insane and that he knew nothing about what happened thereafter until he became conscious or regained his presence of mind in the Muhlenberg county jail on Tuesday following. Grant McKenney was called as a witness for the Commonwealth and testified concerning appellant's visit and conduct at his home on that morning before he went to the mine. McKenney testified that appellant came to his home between 8:15 and 9:30 a. m. armed with a pistol. He was asked if appellant made any statement to him at that time as to what he was going to do with it (meaning the pistol) and he answered: "He said he was leaving today and taking me with him. Q. Did he name anybody else? A. Yes, sir. Q. How many other people? A. Two." The witness was not asked nor did he state the names of the other people referred to, nor was the decedent's name mentioned in the conversation. On cross-examination the witness was asked what was appellant's purpose there at his house and he answered: "Come to bump me off.

"Q. He came to bump you off? A. He said he was leaving.

"Q. Did he make any attempt to bump you off? A. What do you mean?—Put a Gat on me.

"Q. You mean he put a gun on you? A. I think he did. I seen it."

The witness further said that he and appellant had had difficulty about seven years previous to that time but they had had no trouble since then and that he had no personal feeling against the appellant; that they were friendly and that he had forgotten all about it. He further stated that on that morning the appellant further remarked that they had had trouble before. Counsel for appellant then asked the witness if appellant had a daughter about eighteen years old and he said that he had and that he knew the girl. He was then asked: "Now isn't it true that the defendant, Mr. Burden, came — — —." At this point the Commonwealth's attorney objected to the question and then, out of hearing of the jury, counsel resumed his question and asked the witness if the appellant came to his house on that occasion to see him and talk to him about giving his eighteen year old daughter beer on the night before and if that

was what their controversy was about. The court sustained the Commonwealth's objections to the question, whereupon counsel for defendant avowed that "if the witness were permitted to answer he would state it was." Counsel for appellant then moved the court to exclude all the testimony of the witness concerning appellant's visit to his home on that morning and what transpired there on that occasion and that the jury be admonished not to consider it, which motion the court overruled and counsel excepted.

Appellant, testifying in his behalf, related in detail his movements on the morning of February 14, and stated: "I came back and on the way back I stopped at Grant McKenney's house. Q. Why did you go to Mr. McKenney's? A. I went down to get him not to let my daughter have any — — —." At this point the Commonwealth's attorney again objected and the court admonished the jury in this language: "Gentlemen of the jury, that evidence is not material in this case as to why he went, any reason why he went, and you will not consider that in making up your verdict," to which ruling of the court counsel excepted.

In Fugate v. Commonwealth, 202 Ky. 509, 260 S. W. 338, 340, the rule with respect to the admissibility of evidence as to previous threats was clearly stated. We here quote the pertinent part of that opinion: "On his direct examination Jesse Neace, a witness for the accused, testified that some time before the homicide he met the deceased, who stated that, while he was shaking hands with Pot Napier, Boozer (Grover Fugate) stepped up and asked him if he would shake hands with him, whereupon he said, 'Yes; by God, shake hands with a man and kill him too.' On cross-examination he was permitted to testify that later on he met appellant who seemed to be 'pretty harsh about something,' and claimed that he (witness) owed him $50, and said, 'If you don't get that up for me, I am going to kill you.' In overruling appellant's motion to exclude this testimony the court stated in the presence of the jury that it was admissible to show the state of mind the defendant was in, 'if, in the judgment of the jury it does throw any light on that part of the defendant's mind as to whether or not he was in a bad state of mind, or in a good humor.' It is the rule that a general threat to kill some one is admissible to show general malice and a

purpose to injure or kill some one of which the deceased became the victim. Pursuant to this rule, the following threats made by the accused have been admitted: 'I want to kill a man so G— d— bad that I don't know what to do.' Hendrickson v. Commonwealth, 147 Ky. 298, 143 S. W. 993. 'Boys, stay in town tonight; I am going to kill some d— man.' Brooks v. Commonwealth, 100 Ky. 194, 37 S. W. 1043. Here the threat was not a general threat to kill some one. It was a threat against a particular person other than the accused, growing out of a particular transaction, and conditioned on the failure of that person to do a particular thing. It did not show appellant's state of mind towards the deceased or towards a class of which the deceased was a member, or towards mankind in general. It did not serve to establish general malice, but tended only to show special malice towards a particular individual concerning a transaction with which the deceased had no connection, and its admission was prejudicial error.''

In the present case if appellant's statements to Mc-Kenney should be construed as a threat against any one, evidently it was directed to McKenney, but in no event could it be construed as a threat against the deceased. McKenney specifically stated that defendant came to bump him off. He said that appellant mentioned two others in his conversation with him but he did not state that the name of deceased was mentioned or referred to in any manner. If appellant had mentioned the name of deceased in that conversation, it is reasonable to presume that the Commonwealth's attorney would have promptly brought out that fact. We think the rule announced in the Fugate case, supra, is applicable to the present case and the court should have sustained appellant's objections to this evidence. Furthermore, if such evidence had been competent the court committed further error in refusing to permit appellant to testify concerning his purpose or motive in going to the home of McKenney. The Commonwealth having introduced a part of the conversation, appellant was entitled to show all that was said at the time and to state his reasons for his visit to McKenney's home and explain his purpose and motive therefor. Collins v. Commonwealth, 227 Ky. 349, 13 S. W. (2d) 263, and cases therein cited; McElwain v. Commonwealth, 289 Ky. 446, 159 S. W. (2d) 11; Garrison v. Commonwealth, 236 Ky. 706, 33 S. W. (2d) 698.

After appellant had testified that he was rendered unconscious or temporarily insane by reason of the blows on his head with the pistol by Wickliffe and that he had no recollection of what occurred thereafter, and after the close of all the evidence for appellant, Edward Wickliffe was called in rebuttal by the Commonwealth and permitted to testify at length as to what happened while he was at appellant's home and concerning the controversy he had with him. He said he went to appellant's home between 10 and 11 o'clock and, when asked about appellant's condition as to being drunk or sober, he said he was about half drunk; he said to appellant: "You should be ashamed of yourself, drinking this way", and later on in the conversation appellant said: "You accused me of being drunk" and he, the witness, then said: "I didn't accuse you of being drunk. I said you should be ashamed of yourself drinking this way." He said appellant jumped back and drew a gun on him, and further detailed the controversy they had and that he finally succeeded in taking the pistol away from appellant and struck him with it. He further said that appellant threatened to kill him, and said: "You are going away and several more are going with you." After he struck appellant with the gun he went to his truck and appellant followed him to the truck and they had a further controversy or fight in the truck. This evidence was objected to on the grounds of being evidence in chief rather than in rebuttal.

It is true that Wickliffe testified about threats made by appellant against other people and certain other matters about which appellant did not testify. But the requirement that the Commonwealth can introduce only rebuttal evidence if defense has presented its evidence is only directory and the court has discretion in permitting the Commonwealth, after the defense is closed, to present evidence in chief, provided that in the circumstances such would not amount to an abuse of a sound discretion. Section 224, Criminal Code of Practice, and cases cited in notes thereunder. Furthermore, after Wickliffe testified appellant was recalled and testified in rebuttal to Wickliffe and denied or otherwise explained all matters testified to by Wickliffe which were not strictly in rebuttal. If it be conceded that it was error for the court to permit Wickliffe to testify to matters not testified to by appellant, yet since appellant was permitted to rebut Wickliffe's testimony, we

think it removed any prejudicial effect that might have been produced by Wickliffe's testimony which was not strictly confined to matters testified to by appellant when he testified in chief. Also, the court properly instructed the jury that it would consider Wickliffe's evidence in so far only as it may have any bearing upon the question of the state of mind of appellant immediately before and at the time of the homicide. Under the circumstances we do not think that appellant's rights were prejudiced by Wickliffe's evidence.

For reasons stated the judgment is reversed and remanded for proceedings consistent with this opinion.